609 So.2d 291 (1992)
Adrian THIBODEAUX, Plaintiff-Appellant, and
Sophie J. Trahan and Jeannette M. Jolivette, Plaintiffs,
v.
Jerry Don STIVERS and Champion Insurance Company, Defendants, and
Cadron Creek Trucking Company and Progressive Insurance Company, Defendants-Appellees.
No. 91-767.
Court of Appeal of Louisiana, Third Circuit.
November 4, 1992.
Rehearing Denied December 22, 1992.
Allen & Gooch, Raymond Jackson, Lafayette, for defendants-appellees.
Porter, Denton & Kobetz, Aubrey Denton, Lafayette, for plaintiff-appellant.
Before DOMENGEAUX, C.J., LABORDE, J., and PATIN[*], J. Pro Tem.
DOMENGEAUX, Chief Judge.
This suit arose from an automobile accident which occurred on June 8, 1987, when an 18 wheeler driven by Jerry Don Stivers sideswiped a Camero driven by Sophie J. Trahan. Plaintiffs are Trahan and her two passengers in the Camero, Adrian Thibodeaux and Jeannette Jolivette. Defendants are Stivers, his employer, Cadron Creek Trucking Company, and its liability insurer, Progressive Insurance Company. Also named as defendant was Champion Insurance Company, the uninsured motorist insurer of Sophie J. Trahan. Prior to trial, Stivers and Champion were dismissed, and Trahan and Jolivette settled their claims against the remaining defendants. Liability *292 was stipulated. Therefore, the trial of this matter concerned only the amount of damages due to Adrian Thibodeaux.
After a jury trial, Thibodeaux was awarded $10,000 in damages. Thibodeaux appeals the judgment of the trial court alleging, in the alternative, three errors: the unreasonably low award of $10,000, the failure to discharge and replace two jurors, and the failure to declare a mistrial after excusing an ineligible juror. Finding merit to the plaintiff's second contention, we will not address the reasonableness of the award or the failure to declare a mistrial.
During the trial of this matter, three jurors separately approached the trial judge to inform him of circumstances that led each to believe he or she could not be fair and impartial. Juror Ramona P. Smithey described how her sister has lived with a back condition for 30 years, has undergone three surgeries, and holds down a job which requires frequent driving. (See Appendix A.) Juror Kenneth R. Briscoe told the court that he works offshore with Adrian Thibodeaux's brother-in-law and that fact might influence his verdict in this case. (See Appendix B.) Juror Dianne Bourque informed the court that she has run across Adrian Thibodeaux's name in the course of her employment with the child support enforcement office and, as a result, she is highly prejudiced against him. The attorneys were allowed to question each juror. The trial judge excused Bourque and replaced her with an alternate, but Smithey and Briscoe were not excused.
La.C.C.P. Art. 1769(B) requires that alternate jurors shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties. The question we must address, then, is whether jurors Smithey and Briscoe became disqualified and should have been replaced with alternates. Defendants contend the jurors were sufficiently rehabilitated and there was no need to replace them. Thibodeaux contends the trial judge erred in refusing to replace them pursuant to his challenges.
After reviewing the dialogue which took place among the jurors, the attorneys, and the trial judge, we conclude the trial court erred in refusing to replace Smithey and Briscoe with alternates. Both Smithey and Briscoe communicated doubt as to their ability to be fair and impartial. It is true, as defendants contend, that the facts upon which the jurors' hesitations were based are not necessarily grounds for challenges; however, those facts are not the basis of our decision. We are not concerned with juror Smithey's sister's back problem or juror Briscoe's working relationship with the plaintiff's brother-in-law. Rather, we are concerned with the influence those circumstances have on the ability of Smithey and Briscoe to be fair and impartial. The candid admissions of each reveal that neither could be completely fair in deciding this case.
The decision to excuse a juror is within the sound discretion of the trial judge; to constitute grounds for reversal, the trial judge's abuse of discretion must be shown. Dean v. Nunez, 534 So.2d 1282 (La.App. 4th Cir.1988), writ granted and remanded, 536 So.2d 1203 (La. 1989).
In the case of State v. Holland, 544 So.2d 461 (La.App.2d Cir.1989), a juror disclosed during the trial that he may be related to the victim. The juror did not know the victim and stated that even if they were related in some way, the relationship would not affect his decision making and he could still be fair and impartial. In affirming the trial court's denial of the defendant's challenge for cause, the Second Circuit cited State v. Hodgeson, 305 So.2d 421 (La.1974) for the rule that a juror's connection to a witness or victim must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. Similarly, in State v. Hebert, 443 So.2d 620 (La.App. 3d Cir.1983), this court affirmed the trial court's denial of a mistrial when a juror expressed some hesitation about his ability to be fair, but after questioning by the trial judge, stated that he could be impartial and decide according to the evidence and instructions given.
Conversely, in the instant case, the jurors disclosed otherwise innocuous circumstances which they explained might influence *293 their decision making. They were not adequately rehabilitated. Accordingly, the trial judge's refusal to excuse the jurors constitutes a clear abuse of his discretion and we must reverse his decision. Following the pronouncement of the Supreme Court in Dean v. Nunez, 536 So.2d 1203 (La.1989), we conclude that a de novo review is required. In Dean, the Fourth Circuit had remanded for a new trial after determining that the jury was not impartially selected. The Supreme Court granted writs and remanded to the court of appeal to decide the case on the merits based on the record. The earlier cases of Smith v. State Farm Insurance Co., 446 So.2d 1269 (La.App. 4th Cir.1984), writs denied, 449 So.2d 1356, 1360 (La.1984), and Nettles v. Bowlin, on rehearing, 417 So.2d 1192 (La.App. 1st Cir.1982), writs denied, 422 So.2d 416, 417 (La.1982), which were remanded for new trials, are no longer persuasive. Therefore, we set aside the judgment of the trial court and render judgment based on a de novo review of the record before us. See Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
On the date of the accident which is the subject of this suit, Adrian Thibodeaux saw his family physician, Dr. Charles Dugal, and complained of neck and chest pains, bruises, and a swollen and tender finger. A few weeks later, he told Dr. Dugal that his low back pain from a preexisting injury had worsened. For several months, Thibodeaux continued working at his job as an outside insurance agent, but his pain continued. Ultimately, it was determined that the excessive amount of driving required by his job aggravated or increased his pain and he was forced to quit at the end of 1987.
Thibodeaux continued to seek medical care from several physicians in 1988, 1989, and 1990. He was diagnosed as having three disc protrusions, two in the cervical spine and one in the lumbar spine, none of which have resulted in nerve damage. Surgery has been recommended by one doctor, but as of the time of trial, Thibodeaux seemed more comfortable with continued conservative treatment such as pain medication and therapy. Thibodeaux returned to work late in 1988, but left after a few months either because of back pain, as he stated, or low production, as his employer described, or a combination of the two. Thibodeaux did not try working again before the trial in 1990.
Defendants do not seriously dispute the diagnosis of Thibodeaux's spinal condition. Rather, they contend that his condition was caused by two previous accidents, and further, that his condition does not prevent him from working.
After reviewing the medical evidence in detail, we conclude that Thibodeaux sustained an aggravation to his low back injury and a new injury to his neck in the 1987 accident. Prior to this accident, Thibodeaux was diagnosed with a musculoligamentous injury to the lower back; subsequent to this accident, he was found to have multiple disc protrusions. Before this accident, he complained of severe pain and was unable to do heavy work. Long periods of driving would not have been recommended and had already started to cause increased back pain. After this accident, his low back pain continued sporadically, he had intermittent complaints of neck pain, and was unable to continue his job which required long periods of driving. Thibodeaux has participated only in conservative management of his condition, and it is not clear whether he will actually go through with the surgery recommended by one physician. In any event, Thibodeaux was disabled before this accident and is now disabled to a greater extent as a result of this accident. Accordingly, he is entitled to a general damage award of $80,000. See, for example, American Motorist Insurance Co. v. American Rent-All, Inc., 579 So.2d 429 (La.1991); Hardy v. Delta Downs, Inc., 599 So.2d 364 (La.App. 3d Cir.1992); and Fontenot v. Cooper, 599 So.2d 883 (La. App.3d 1992).
Thibodeaux is also entitled to recover the medical expenses he incurred or will incur as a result of this accident. His past expenses total $21,941.88. Although it is undoubtedly true that Thibodeaux would have had some expenses in spite of the 1987 *294 accident due to his preexisting condition, it would be impossible to categorize the expenses based on the expected progress of his preexisting condition had the 1987 accident not occurred. Therefore, we will award the full amount of past medical expenses. Concerning future medical expenses, we have already noted that the evidence is not clear as to Thibodeaux's intention to undergo the surgery recommended by one doctor. It is clear, however, that Thibodeaux will require further treatment, perhaps indefinitely. Accordingly, we will award $10,000 in future medical expenses.
Turning to economic damages, we conclude that Thibodeaux met his burden of proving past wages in the amount of $67,066.00. At the time of this accident, he was successfully employed in an insurance sales position which required long periods of driving. He was unable to continue this type of work after the accident. Concerning future lost wages, however, we find no evidence indicating that Thibodeaux is unable to work. Because of his previous injury, Thibodeaux was restricted from heavy manual labor and had complaints, before this accident, of low back pain as a result of excessive driving. We find that Thibodeaux's preexisting condition would have rendered him unable to continue his insurance sales job even had the 1987 accident not occurred. We further find that Thibodeaux is not disabled from reentering the work force in a position consistent with his abilities and experience. Therefore, Thibodeaux is not entitled to an award of future lost wages.

DECREE
It is ordered, adjudged, and decreed that the district court's judgment in favor of Adrian Thibodeaux be increased to the amount of $179,007.88, with legal interest from date of judicial demand. All costs are taxed to defendants, Cadron Creek Trucking Company and Progressive Insurance Company.
JURY VERDICT SET ASIDE AND JUDGMENT RENDERED.
APPENDIX A
RAMONA P. SMITHEY
being first duly sworn, stated as follows:
BY THE COURT:
Q. When we recessed, you said you wanted to speak to the judge and the lawyers and we went in my office and you told us some things about your attitude in this case. Can you repeat that for the record?
A. Yes. It was concerning the injury to the back. I'm familiar with some of the different things the attorney for the plaintiff was discussing, in the back. And being familiar with my sister's problems since she was 20 she's going to be 48 next month which was a birth defect. She's had three back surgeries and she still has maintained her job. She is a high school graduate and maintained her job with Farmers Home Administration for the last, I'd say, eight or nine years, and she does a lot of driving and none of the driving affects her, her back, that much. And she is in pain, as much painI'm familiar with the different
THE COURT: The plaintiff is not in here. Do you want him in here?
MR. DENTON: (Indicates negatively)
THE COURT: It doesn't matter?
A. I just want to be fair with the plaintiff.
Q. And you have somebody else in your family?
A. My son also has the same deformity. It's whatever is in between each vertebra, that it's missing in their backs. And he stillhe's a driller for Power Rig. He loves his work is the reason he does that work, and it doesn't seem to bother him. Well, the doctors say it will after he's thirty years old in one way or the otherit will affect him in some way.
Q. You say you wanted the lawyers to know this?

*295 A. To know that. And I see my sister driving and in painshe's in pain, but the driving doesn't seem to make it any worse or any better. And that was one of the things you brought up was his inability to sit in a car, to drive.
Q. Is that all you have?
A. That's it.
THE COURT: Do you want to question her, Mr. Denton?
MR. DENTON: Your Honor, if I may.
BY MR. DENTON:
Q. I understand that, from what you said, it would be hard for you to put that out of your mind?
A. Right. If it wouldn't be my one and only sister, if I wouldn't sympathize with her when she does complain did complainshe had her first surgery when she was 20 years old.
Q. And you're saying that because of that it would be hard for you to be a fair and impartial juror in this case, because it involves the driving and the back?
A. Right.
Q. And because of that, you would prefer to step down from the jury?
A. Well, I'm leaving it up to you, but I thought you should know. That's what keeps flashing through my mind, is my sister who is still working and driving.
MR. DENTON: That's all. Thank you, Judge.
THE COURT: Do you want to question her, Mr. Jackson?
BY JACKSON:
Q. Ms. Smithey, I just have one question. We haven't heard any evidence, we've just heard argument. Are you telling us that after you hear all the evidence that you would be prejudiced to the defendant because of what your sister has gone through?
A. I'm not sure. I'm really not sure. I cannot look at him right now, because I'm the kind of person, I feel sorry for himWhen you speak I feel sorry for him; when you speak, I don't, you know. I think maybe I can after I hear it all, but sitting here just this morning, is all I could see, was my sister's back and problems she's had and she's still working, and here we're going through all of it. You know what I mean, the expense and everything. But I will try to do the best I can. I'm not trying to get out of it.
Q. I understand.
MR. JACKSON: That's all I have, Judge. Thank you.
THE COURT: You may go outside and be back in a few minutes.
MS. RAMONA P. SMITHEY: All right.
THE COURT: Ms. Smithey, do not discuss what you've told us with any of the other jurors.
MS. RAMONA SMITHEY: Oh, no. That's why I waited. No, I won't.
THE COURT: Ms. Smithey, have you discussed this with any of the jurors?
MS. RAMONA P. SMITHEY: No, I haven't. No, I didn't know about all of this coming out. I knew just the preliminaries yesterday.
APPENDIX B
KENNETH R. BRISCOE
being first duly sworn, stated as follows:
BY THE COURT:
Q. What is your name?
A. Briscoe.
Q. Briscoe? What is your first name?
A. Kenneth.
Q. You were telling us in my office that you think that you might have worked for, what, about eight years you said
A. About eight years.
Q. With a man that you think might be the brother-in-law of the plaintiff, Thibodeaux; is that right?

*296 A. Yes, sir.
Q. And you're not sure of that?
A. No, sir, but I believe I recognize his wife sitting down in the back of the courtroom.
Q. All right; and you wanted to tell us that. Did I ask you whether you thought that would influence your verdict?
A. Yes, sir, you did.
Q. And what did you say?
A. Well, I don't know if it would necessarily affect the verdict, but it would make for poor working relationships with the brother-in-law, if it is, the fact that his brother-in-law
Q. In other words, you're thinking or saying that if you decide against Mr. Thibodeaux, his brother-in-law might not like it?
A. Yes, sir.
Q. And it might make a poor relationship between you and the brother-in-law?
A. Yes, sir.
Q. Is there anything else you wanted to say about this problem?
A. Well, we work seven and seven offshore, and a lot of times there's but two people on the platform, and I've worked with hiswell, what I think is his brother-in-law on the same platform, many a time, just him and I together on a platform, and I think that would make a poor working relationship if that was the case.
* * * * * *
BY MR. JACKSON:
Q. Mr. Briscoe, are you telling the court that if you continue to sit on this jury that, because of the relationship that you had and apparently still have with Mr. Chenier, that it could influence the outcome of your verdict? And if so, whose side would you favor?
A. Well, I can't really say which side I would favor. I mean, I don't know nothing about the case so far, I mean, more than what y'all just finished saying. But my point is, I'd hate to have to work on the same platform with a man knowing that I sat on the jury and him knowing that I sat on a jury deciding the fate of his brother-in-law.
THE COURT: Deciding what? The fate?
A. Well, I mean, the outcome of this trial.
THE COURT: Anything else?
Q. Mr. Briscoe, do you think that because of your concern about your future working relationship with Mr. Chenier that you would tend to favor Mr. Thibodeaux?
A. Not necessarily, but there is no doubt in my mind that it would be in back of my mind. I mean, it would have to be.
MR. JACKSON: Thank you.
BY MR. DENTON:
Q. Mr. Briscoe, do you think you could base any verdict on the evidence as presented and the law that the judge instructs you to apply?
A. Yes, but I'd hate to.
Q. But do you think you could do it?
A. I believe I could. But, like I said, I'd hate to.
THE COURT: Well, a lot of times, being a juror or a judge is unpleasant, but it has to be done. Is there a motion?
A. Your Honor, could I say one more thing?
THE COURT: Yes.
A. On these platforms, a lot of times you know, I'm not saying, but just to give you an example, a lot of times you come up with emergency situations offshore and if there's bickering between the man you're working with, I mean, it could, you know, it could get out of hand. Now, if the man is not Mr. Chenier's brother-in-law, *297 I don't have any problems with it.
NOTES
[*] Judge John A. Patin, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.