| ¡¡DALEY, Judge.
The defendant, Dr. Richard Roberts, III, has appealed a jury verdict finding him liable in the death of plaintiffs’ six year old son, Aaron. For the reasons which follow, we affirm.

FACTS:

Plaintiff, Marina Bourgeois, testified that her six-year-old son, Aaron, complained of a headache and began to run fever in the early morning hours of Monday, March 10, 1997. She treated the fever with Tylenol and he stayed home from school that day. The fever returned Monday night and during the day Tuesday. He was again treated with Tylenol and Motrin. On Wednesday evening Aaron vomited. When Aaron awoke on Thursday morning, he complained that his knee hurt. Mr. and Mrs. Bourgeois took Aaron to their family physician, Dr. Colin Bailey. Dr. Bailey noted no abnormal findings on an x-ray of Aaron’s knee, and told his Lparents to continue to give him Ibuprofen for the fever and fluids. Mrs. Bourgeois testified that Aaron vomited and had diarrhea on Thursday night. When Aaron awoke on the morning of March 14, 1997, she noted that he did not “look well” and wanted to go back to bed. Mrs. Bourgeois called Dr. Bailey, who told her to return to his office. While sitting in the doctor’s office with her son in her lap, Mrs. Bourgeois felt Aaron “get limp.” Concerned that he may have lost consciousness, she knocked on the door to alert Dr. Bailey’s staff. Mrs. Bourgeois testified *243 that she was taken to the back where an intravenous line was'started and an ambulance was called.
Mrs. Bourgeois testified that when-they arrived at the hospital, she signed Aaron in, then went to his bedside. He complained of pain and asked to have the intravenous line taken out. She testified that as they remained in the emergency room Aaron’s condition worsened, his hands turned white and his eyes “looked bigger than normal.” Mrs. Bourgeois testified that the nurses had to bring, in heated towels in order to draw blood. When the “code” alarms went off Mrs. Bourgeois was asked to leave the room and was taken to the chapel, where she was later told her son had died. The medical records indicate that Aaron arrived at the hospital at 11:45 a.m., the code alarms went off at 3:20 p.m., and he was pronounced dead at 3:56 p.m.
Mr. Aaron Bourgeois, Sr.’s testimony regarding Aaron’s illness corroborated that of Mrs. Bourgeois. Mr. Bourgeois testified that his wife called him on the 14th and told him they were bringing Aaron to the emergency room. She called again to tell him that Aaron was not doing “too good.” Mr. Bourgeois testified that he arrived at the emergency room at approximately 3:00 p.m. He described Aaron as having dilated eyes and white hands and feet. Mr. Bourgeois testified that Aaron did not respond when he spoke to Aaron. Mr. Bourgeois testified that the people at the hospital told him his son had diabetes. He was holding Aaron when the alarms went | Boff. Hospital personnel came in and he and his wife were taken to the chapel where they were later told Aaron had died.
The deposition of Dr. Susan Garcia, the pathologist who performed the autopsy, was read to the jury. Dr. Garcia concluded that Aaron died of cardiac arrhythmia due to electrolyte imbalance due to dehydration' secondary to probable viral gastroenteritis. She testified that she was given a history of , nausea and vomiting, possible diabetes mellitus, and Reyes syndrome had been ruled out. She testified that during the autopsy she noted Aaron’s intestines contained fluid fecal material. Dr. Garcia explained that this is an abnormal finding in that the bowel usually contains solid fecal matter. When a person develops an. abnormality in the cells of the intestines, such as gastroenteritis, fluid is not absorbed from the bowel back into the body. She referred to this build up of fluid in the bowel as third space volume loss, explaining that fluid that is normally in the blood stream is lost to the bowel and this leads to dehydration. Dr. Garcia testified that even in the absence of the history of vomiting and diarrhea, she would have reached the same conclusion due to the amount of fluid found in his intestines. Dr. Garcia went on to explain that the ability of the heart to function is impaired when certain electrolytes in the body are out of balance. She stated that she reached her conclusion as to the cause of death after reviewing the autopsy findings and pre mortem laboratory results. Dr. Garcia explained that there were no findings that would suggest Reyes syndrome or long-standing diabetes mellitus. She was unable to rule out acute onset diabetes.
Dr. Paul Robert Perchonock, who was accepted by the court as an expert in the field of emergency medicine, testified on behalf of the plaintiffs. Dr. Perchonock testified that Aaron had abnormal vital signs upon admission to the emergency room. Dr. Perchonock explained that, the temperature of 96.4, pulse of 136, respira-tions of | fi32, and urinary output of only 10 cc’s during the entire emergency room stay were signs of impending shock. He stated that Aaron’s body simply “wore *244 out” from breathing so fast, he stopped breathing and his heart stopped beating.
Dr. Perchonock criticized Dr. Roberts for not monitoring Aaron’s blood pressure, for not properly assessing Aaron’s capillary refill and peripheral pulses, and for administering the wrong intravenous fluids in the wrong amounts. Dr. Perchonock explained that it is important to assess capillary refill and peripheral pulses in a dehydrated child because as the blood volume becomes lower, blood is shunted away from the extremities and to the organs.
Dr. Perchonock explained that because of Aaron’s dehydration, he needed intravenous fluid containing a lot of saline or salt. Aaron arrived at the emergency room with a solution of dextrose 5% in water infusing. Shortly thereafter, the fluid was changed to dextrose 5% with l% normal saline.” Dr. Perchonock opined that because the salt concentration in this solution was too low, the fluid would not stay in the blood vessels. Dr. Perchonock also explained that due to fever and rapid respirations, Aaron needed extra fluids because he was “quarts” behind in fluid. Dr. Perchonock further complained that when Dr. Roberts made the decision to administer a fluid “bolus” to Aaron, he gave 250 cc’s rather than 450 cc’s. Dr. Perchonock also pointed to certain laboratory results to support his opinion that Aaron was severely dehydrated when he arrived at the emergency room. As to the elevated blood glucose shown in the laboratory reports, Dr. Per-chonock testified that this was due to the dextrose being administered in the intravenous fluids and/or the blood being drawn in close proximity to the intravenous fluid infusion. Dr. Perchonock opined that Aaron should have been given a solution of sodium bicarbonate intravenously soon after arrival to the hospital because his laboratory |7results indicated he was acidotic. Dr. Perchonock concluded that all Aaron needed was “salt and water” and if he had been given sufficient fluids, he would have been “fine.”
Daphne Caldwell, the nurse who cared for Aaron in the emergency room, testified for the defense. Ms. Caldwell testified when Aaron arrived at the hospital, he was awake and talking. She testified that although it is not noted in the medical records, she checked his capillary refill and it was normal. She further testified that his skin was warm and dry to touch, his lips were pink and moist, and his skin turgor was normal. Ms. Caldwell explained that Aaron was “sleepy and tired”, but always easy to arouse. She stated that in accordance with the emergency room’s policy for care of children under 12 years of age, Aaron’s blood pressure was only taken upon admission.
Ms. Caldwell stated that Dr. Roberts was always attentive to Aaron and was in and out of'Aaron’s room on many occasions. She did not find Aaron’s presentation unusual even in light of the elevated pulse and respirations. She explained that a number of things, including pain from blood being drawn and x-rays being taken, could raise these numbers. Ms. Caldwell recalled that Aaron stood up at times while he was in the emergency room, although this is not reflected in the medical records. Ms. Caldwell testified that Dr. Roberts had diagnosed Aaron as having diabetes and the decision had been made to transfer him to another hospital. While she was on the phone arranging the transfer, she noticed Aaron’s heart rate decrease.
Dr. Karl Hanson, who was accepted by the court as an expert in family medicine, testified for the defense. Dr. Hanson testified that it would have been impossible for the small amount of dextrose Aaron received to raise his blood glucose!«level to 495. Dr. Hanson did not believe that the blood for the laboratory tests had been *245 drawn above the intravenous line because the autopsy report showed the intravenous catheter to be in the left arm with a puncture wound in the right arm. He opined that the vital signs did not show a critically ill child. Dr. Hanson stated^ that Aaron had mild to moderate dehydration when he was presented to the hospital. Although Dr. Hanson stated that he had no reason tó disbelieve Dr. Garcia, he whs unable to say that the dehydration caused the cardiac arrest.
The defendant,- Dr. Richard Roberts, III, was accepted by the court as an expert in emergency medicine. Dr. Roberts testified that although Aaron’s vital signs were abnormal, he was talking and had no signs of severe dehydration and was not in hypo-volemic shock. He acknowledged that it was unusual to have a child come to the emergency room from a physician’s office in an ambulance with an intravenous line. Dr. Roberts explained- that' he thought Aaron had an infection, so he ordered a chest x-ray and laboratory tests. When the laboratory tests indicated a very elevated glucose, he had the lab repeat the test. The first test came back at 495 while the second test came back at 383. He agreed that Aaron had moderate dehydration and explained that he wanted to gently re-hydrate him. He diagnosed Aaron as having acute onset diabetes and was in the process of transferring him to another hospital when his heart rate decreased. Aaron developed a terminal cardiac rhythm and was unable to be resuscitated. Dr. Roberts disagreed with Dr. Garcia’s conclusion as to the cause of death, stating that there were no signs of dehydration on the autopsy.
Dr. Charles Preston, who was accepted by the court as an expert in emergency medicine, testified for the defense. He explained to the jury that he and the other two physicians on the medical review panel concluded that Dr. Roberts’ care of Aaron |flmet the standard of care. Although Dr. Preston had known Dr. Roberts for years, he felt that his review of this case was impartial.
Dr. Preston testified that the fluid replacement was appropriate. He disagreed with Dr. Garcia’s conclusion as to the cause of death, explaining that the acute onset diabetes caused the acidosis, which caused his breathing to increase. The diabetes caused a breakdown in the blood brain barrier that caused Aaron’s brain to swell, which caused him to stop breathing. Dr. Preston opined that Aaron had acute diabetic keytoacidosis, but acknowledged that Aaron did not have the expected finding of ketones in his blood. He explained that the mortality rate for a child in this condition is 90%. Dr. Preston stated that the findings on autopsy did not show signs of diabetes because it was not long standing; rather the diabetes was unmasked by the stress of the gastroenteritis. He disagreed with Dr. Garcia’s conclusion because there were no findings on the autopsy to suggest severe dehydration and the autopsy findings indicated cerebral edema. While Dr. Preston acknowledged that cerebral edema occurs during the resuscita-tive attempts, he opined, based on the degree of edema described in the autopsy, that the cerebral edema was not a terminal event.
. The medical records of Dr. Bailey dated March 14, 1997, indicated that Aaron had “vomiting and diarrhea all night” and “decreased alertness.” Portions of the record are not legible, but one portion states that Aaron was “arousable.” His vital signs, with the exception of a temperature of 97.2, are not recorded on the record. The record indicates that an intravenous line was started and he was taken to the emergency room in an ambulance.
*246 The autopsy report, signed by Dr. Garcia, states that the pre-mortem laboratory results indicated “dehydration and electrolyte imbalance.” The report goes on to state “although not usual in a child, this can be severe enough to cause a ventricular | ^arrhythmia.” The report concludes that the source of vomiting and diarrhea is “most likely viral gastroenteritis.”
At the conclusion of trial, in a 9-to-3 verdict, the jury found Dr. Roberts liable for Aaron’s death. This .suspensive appeal followed.

CHALLENGE FOR CAUSE:

Appellant urges several Assignments of Error, including one Assignment of Error claiming the trial court erred in refusing to disqualify a juror for cause after the juror stated he could not be impartial. Specifically, appellant argues the trial court erred in failing to grant his challenge for cause with respect to juror Warren Jones, who openly admitted bias in favor of the plaintiff. Because the trial court refused to grant the challenge for cause, Dr. Roberts was required to exhaust his peremptory strikes prior to the empaneling of the jury.
A civil juror shall be stricken for cause when there' is a relationship between a party and the juror “such that it must be reasonably believed that [the relationship] would influence the juror in coming to a verdict.” C.C.Pr. Art. 1765.
Dr. Roberts challenged prospective juror Jones for cause based on his admitted bias in favor of the plaintiff, his previous knowledge of the case, and his belief that he had been mis-diagnosed at River Parishes Hospital. After he admitted to knowing the family, Mr. Jones was asked by the trial judge if he could be impartial. He stated that he could. Then the trial judge asked the entire panel if they could follow the law and apply it to the facts as they found them. There was no response.
She then specifically asked Mr. Jones if there was any reason he could not serve on the jury and he stated “me knowing the plaintiff.” She then asked Mr. Jones any other reason other than what he had already stated. There was no response. The plaintiffs’ In attorney then questioned Mr. Jones who again stated that .he could be impartial. Then the • following exchange took place between counsel for Dr. Roberts and Mr. Jones:
MR. COWAN: Mr. Jones, you know the Bourgeois, Mr. Bourgeois and some of his family members, and you’ve testified that you think that you can be impartial. Let me ask you this, Mr. Jones, because if I was in your shoes I might have difficulty here. Let’s say that you’re selected to this jury and that you do not believe,, after hearing all the evidence, that any money should exchange hands in this case, you see Mr. Bourgeois or some of his family members on the street or at church or at some function, would that bother you?
MR. JONES: It would.
MR. COWAN: It would. So you feel if, if you were on this jury you would do your level best, like everybody, to be fair and impartial but because you, as opposed to the other people in the box know the family and may know something about this incident, that you, you would tend to be more leaning towards the plaintiff than the defendant, is that correct?
MR. JONES: Yes.
After the jury panel was removed from the room, the defendant’s attorney challenged Mr. Jones for cause. The attorneys for both sides then discussed Mr. Jones stating that he could be impartial, then stating that he would be influenced. The ■ trial judge granted the challenge for cause. At that point, the attorney for the plaintiffs, argued that .he believed that Mr. Jones *247 had always stated that he could be impartial. The court reporter then read a portion of the questioning to the court. The trial judge acknowledged that Mr. Jones stated that “it would be hard to look at them but it didn’t say, he didn’t say it would affect his judgment, though.” Dr. Roberts’ attorney then pointed out that not only did Mr. Jones state that he would be influenced because he knew the plaintiffs, Mr. Jones also stated that he had been mis-diagnosed in the emergency room at River Parishes Hospital. The plaintiffs’ attorney then argued that Mr. Jones stated he could be impartial. At that point, the trial judge reversed her prior ruling and denied the challenge for cause.
|1PIt is apparent from reading the transcript of the voir dire of Mr. Jones that he felt he could not be impartial. Had Mr. Jones initially stated that knowing the plaintiffs would influence him, then stated that he could be impartial, perhaps we could find that Mr. Jones had been successfully rehabilitated. However, that is not the case. Mr. Jones stated to the trial judge that he could not serve on the jury because he knew the family, then stated to Dr. Roberts’ attorney that he would be influenced because he knew the family. Additionally, Mr. Jones stated that it would be “complicated” for him to base his verdict on the evidence alone since he felt that plaintiffs’ child had been mis-diag-nosed at River Parishes Hospital emergency room. The trial judge’s failure to grant the defendant’s challenge for cause with respect to Mr. Jones was a clear abuse of discretion. Therefore, we set aside the judgment of the trial court and conduct a de novo review of the record before us. See Dean v. Nunez, 536 So.2d 1203 (La. 1989); Thibodeaux v. Stivers, 609 So.2d 291 (La.App. 3 Cir.1992). Appellant’s Assignments of Error regarding the jury verdict form and the denial of his JNOV are moot because we find that a de novo review is required. However, it is necessary to discuss appellant’s Assignment of Error regarding the testimony of Dr. Percho-nock.

FAILURE TO CONDUCT DAUBERT HEARING:

On February 12, 2001, the defendant filed a Motion in Limine urging the court to prohibit plaintiffs’ expert, Dr. Perchonock, from testifying. The motion discussed defendant’s position as, to Dr. Perchonock’s lack of qualifications and concluded that under the Daubert standard that an expert must be able to offer testimony that is both reliable and relevant, Dr. Perchonock should not be allowed to testify. On the morning of trial, the trial court held a hearing on defendant’s Motion in Limine. 1 ^Defense counsel made extensive arguments claiming that Dr. Perchonock should be prohibited from testifying because he did not currently practice emergency medicine and was not currently board certified in emergency medicine. Plaintiffs attorney explained that Dr. Perchonock was board certificated in emergency medicine for 20 years, until the end of 2000, and was currently teaching and supervising residents in emergency medicine. The trial judge concluded that Dr. Perchonock was qualified to testify as an expert in emergency medicine and would allow questioning as to his credentials during his testimony.
On appeal, appellant argues that the trial court erred in refusing to conduct a pre-trial Daubert hearing to evaluate the reliability and relevance of the opinion testimony of Dr. Perchonock. Although the trial judge stated that had she realized defendant was asking for a Daubert hearing, she would have had it prior to trial, she did allow extensive arguments regarding Dr. Perchonock’s qualifications. The trial judge concluded that she would allow *248 him to testify as an expert, but would allow extensive examination into his credentials. We see no error in her ruling. Further, appellant has attacked Dr. Perchonock’s opinion based on his qualifications. This goes to the weight and credibility of Dr. Perchonock’s testimony, rather than the scientific basis for his testimony as in Daubert. Appellant’s objection to Dr. Per-chonock’s testimony is based on the fact that Dr. Perchonock was not board certified in emergency medicine at the time of trial and had not worked in an emergency room in a number of years. Dr. Percho-nock explained to the court that he was board certified in emergency medicine in 1980 and was recertified in 1990. In order to continue his certification, he needed to retake the examination in 2000, and he did not do so. He explained that he had four years during which he could retake the examination and become recertified. With regard to his experience in emergency 114medicine, Dr. Perchonock testified that he worked full time in an emergency room for 18 years. At the time of trial he was teaching emergency medicine and ambulatory care medicine to students in a residency program. Dr. Perchonock was qualified to testify as an expert in emergency medicine. [1]

DE NOVO REVIEW:

The evidence before us indicates that there was a significant change in Aaron’s condition on the morning of March 14, 1997. Mrs. Bourgeois testified that when Aaron awoke, he did not look well, he wanted to lie down again, and was very sluggish. She stated that it seemed that he lost consciousness while waiting to see Dr. Bailey. She stated that his condition worsened in the emergency room, his hands were white, and his “eyes looked bigger.” Mr. Bourgeois testified that his wife called to tell him Aaron was going to the emergency room and called again as Aaron’s condition worsened. Mr. Bourgeois arrived in the emergency room about 20 minutes before the code and stated that Aaron would not respond when spoken to. He also described Aaron’s hands as white and his eyes as “dilated.” • '
Aaron arrived at River Parishes Hospital at 11:45 a.m. with a temperature of 96.4, pulse of 136, and respirations of 32. All of the physicians who testified agreed that these were signs of dehydration and could be signs of impending shock. The physicians disagreed as to whether the dehydration was moderate or severe. All physicians agreed that the treatment for dehydration is to administer fluids. Although hsthe defendant’s experts testified that the fluid bolus of 250 ccs given in the emergency room, based on 10 ccs per kilogram was appropriate, they agreed that the medical literature recommends a larger fluid bolus' based on 20 ccs per kilogram.
Although Nurse Caldwell described Aaron’s skin as being warm - to touch, this seems unlikely in view of his subnormal temperature. Additionally, Mrs. Bourgeois testified that there was difficulty in drawing Aaron’s blood, so the nurses brought in heated towels and placed them on Aaron’s arms. The medical testimony indicated that with impending shock, blood is shunted away from the extremities and to the organs, thus, the fact that heated towels were used to assist in getting blood to flow in Aaron’s arms also points to evidence of impending shock. While we *249 acknowledge that the defendant’s experts’ explanation of Aaron’s death being due to cerebral edema from acute onset diabetes and diabetic keytoacidosis seems plausible, the blood work lacks an essential element of that diagnosis-ketones in the blood. Additionally, Dr. Domangue admitted that cerebral edema was not mentioned in his deposition, nor in his report to the medical review panel.
Dr. Bailey’s office record indicates that once he examined Aaron, he wasted no time in starting an intravenous line and transferring him to the hospital. Dr. Roberts agreed that it was unusual to receive a pediatric patient in the emergency room who arrived via ambulance from a physician’s office where an intravenous liiie had been started.
The autopsy report indicates that Dr. Garcia reviewed the laboratory tests from River Parishes Hospital and concluded they showed dehydration and electrolyte imbalance. After conducting the autopsy in which she discovered an abnormal amount of fluid in the bowel, Dr. Garcia concluded that the dehydration and electrolyte imbalance resulted in Aaron’s death.
|16Dr. Roberts argued that the trial court erred in not allowing the jury verdict form to include Dr. Bailey and River Parishes Hospital as potentially hable parties. While we do not find it necessary to discuss this issue in detail due to the de novo review, we note that there was absolutely no evidence presented to support a finding of liability on the part of Dr.' Bailey or the hospital. A party alleging comparative fault has the burden of proof that negligence of the other party was a cause in fact of the accident. Dr. Perchonock initially issued a report finding both Dr. Bailey and the hospital liable then retracted this position at trial. The medical review panel decision indicates the panel found no breach of the standard of care by Dr. Bailey and the hospital.
We have reviewed all of the evidence in detail and conclude that it is more probable than not that Aaron died of an electrolyte imbalance due to dehydration due to gastroenteritis. The evidence also supports the conclusion that had larger amounts of intravenous fluid been administered, it is more probable than not that Aaron would not have died in the emergency room. Since Dr. Roberts was the only physician who attended Aaron prior to the code, we find the plaintiffs proved by a preponderance of the evidence that Dr. Roberts breached the standard of care in his treatment of Aaron and this caused Aaron’s death. We now turn to the issue of damages.

DAMAGES:

The jury in this case awarded Mr. and Mrs. Bourgeois $300,000.00 each for damages arising from the death of their son. The jury also awarded $5,589.00 for medical and funeral expenses and $100,000.00 for Aaron’s mental physical pain and suffering. The award was reduced to $500,000.00 by the trial judge pursuant to the statutory cap. Although we are not bound by the jury award and trial court judgment, |17we are guided by the jury award, but limit the award to the statutory cap of $500,000.00.
Aaron was six years old at the time of his death. Both parents testified as to the loss of their only son, who had been a healthy child up to this illness. Mrs. Bourgeois testified that both of her pregnancies were planned and she was thrilled when her firstborn was a girl. A few years later she became pregnant again and Aaron was born. Mrs. Bourgeois explained that she did not want a large family and had a tubal ligation after Aaron’s birth. Aaron and his sister were very *250 close. Mrs. Bourgeois underwent counseling for depression after Aaron’s death. It is apparent that Mr. Bourgeois was also close to Aaron, describing Aaron as a “vel-cro baby,” meaning Aaron accompanied his father wherever he went. Mr. Bourgeois testified that he is unable to participate in some activities that he shared with Aaron.
We find that $300,000.00 to each parent is an appropriate award given the facts and circumstances of this case. See Craighead v. Preferred Risk Mut. Ins. Co., 33,731 (La.App. 2 Cir. 8/25/00), 769 So.2d 112; Dartlone v. Louisiana Power and Light Co., 33,597 (La.App. 2 Cir. 6/21/00), 763 So.2d 779; In re Medical Review Panel Bilello, 621 So.2d 6 (La.App. 4 Cir.1993), writ denied 629 So.2d 1139 (La.1993).
The defendants complain that the award of $100,000.00 for the pain and suffering endured by Aaron is excessive. Damages for pain and suffering are warranted where there is any evidence of pain, on the part of the decedent. Samuel v. Baton Rouge Gen. Med. Center, 99-1148 (La.App. 1 Cir. 10/2/00), 798 So.2d 126, writ denied, 2000-1314, 2001-1329 (La.6/23/00), 765 So.2d 1044 and 1066. In determining the appropriate quantum for pain and suffering, we must look to the severity and duration of the pain and suffering. Id. Recovery can only be made for 11sdamages actually suffered by the decedent from the time of injury to the moment of death. Id.
Mr. and Mrs. Bourgeois testified that Aaron experienced pain, discomfort, and anxiety prior to his death. Mrs. Bourgeois testified that Aaron cried out in pain and resisted having his blood drawn. Mr. Bourgeois testified that Aaron did not respond when spoken to, that his eyes were dilated, and that his hands and feet were discolored. The medical records indicate that his heart rate and respiratory rate remained significantly elevated until the fatal drop in heart rate. All of the medical experts agreed that after the 250 cc fluid bolus was administered, his heart rate and respiratory rate decreased somewhat.
We note that the treatment for Aaron’s condition required that blood be drawn and that fluids be infused intravenously. Further, Aaron cannot recover for pain and suffering he endured during his entire hospital stay, rather, he can only recover for pain and suffering experienced following the act' of malpractice. All of the medical experts testified that the recommended fluid bolus was 450 ccs. Thus, we find that Aaron can only recover for pain and suffering from the time the inadequate fluid bolus was completed, 2:15 p.m., until the time of his death, 3:56 p.m. The medical records indicate that after the fluid bolus, Aaron was administered Insulin. When his heart rate began its terminal descent and arrhythmia, a tube was placed in his throat, another tube was placed in his nose, and he was stuck with several needles, including at least two times through his chest wall into his heart. The autopsy report indicates that an additional tube was placed in a vein in his neck; All of these were invasive procedures that would have caused severe pain. Quantifying a damage award in this situation is difficult, so we look to cases in which young children received awards for pain and suffering based on a short duration of suffering before death. These cases | 19range from $15,000.00 awards to drowning victims (St.Hill v. Tabor, 549 So.2d 870 (La.App. 5th Cir.1989)); (Turner v. Parish of Jefferson, 98-336 (La.App. 5 Cir. 10/14/98), 721 So.2d 64) to a $50,000.00 award to an infant who lived for 36 hours after birth (Dent v. Perkins, 629 So.2d 1354 (La.App. 4th Cir.1993)) and $50,000.00 to an infant who died approximately 20 hours after the failure to diagnose meningitis in the emergency room *251 (Etcher v. Neumann, 2000 2282 (La.App. 1 Cir. 12/28/01), 806 So.2d 826). Using these cases as a guideline, and given the facts and circumstances of Aaron’s demise, we award $50,000.00 for his pain and suffering.
Our award of damages is limited to $500,000.00 pursuant to the medical malpractice act. Therefore, we reduce the above awards from $650,000.00 to the statutory maximum of $500,000.00. Additionally, we award judicial interest from the date of filing the request for the medical review panel, plus costs. In accordance with the medical malpractice act, Dr. Roberts is cast in judgment for $100,000.00 plus interest, while intervenor, The Louisiana Patients’ Compensation Fund, is cast in judgment for $400,000.00 plus interest and costs, including the cost of this appeal.

CONCLUSION:

For the foregoing reasons, the judgment of the trial court is affirmed.

AFFIRMED.

. It was not clear why Dr. Perchonock chose not to retake the recertification exam. He testified that at the time of trial, he taught emergency medicine to residents, however, a close reading of his testimony indicates that he taught the residents on the ambulatory care side of the emergency room and that he only'took the residents to the emergency side of the room when there was a critical patient that they "discuss.”