833 So.2d 1276 (2002)
Andrew WATSON, et al, Plaintiffs-Appellants,
v.
Dr. Steven BRAZEEL and The Medical Protective Company, Defendants-Appellees.
No. 36,499-CA.
Court of Appeal of Louisiana, Second Circuit.
December 18, 2002.
*1277 Jay A. Pucheu, Marksville, for Appellants.
Crawford & Anzelmo, by Brian E. Crawford, Monroe, Jefferson B. Joyce, Baton Rouge, for Appellees.
Before BROWN, WILLIAMS, GASKINS, CARAWAY and DREW, JJ.
BROWN, C.J.
On November 17, 1995, plaintiff, Andrew Watson, suffered a laceration on top of his foot when it was caught in a garbage press at work. The wound was superficial and of almost no depthat best one centimeter. Mr. Watson went to St. Francis Medical Center OccuMed Clinic and was seen by Kalisa Ramsey, a nurse practitioner, and Dr. Steven Brazeel. Mr. Watson claims that the wound was not properly cleaned, became infected and required surgery. Approximately one month later, surgery was performed by Dr. Brian Bulloch, an orthopedic surgeon, who removed debris or foreign particles from the wound that could be easily seen by the eye. Dr. Bulloch concluded that this debris was from the work injury.
Mr. Watson was given intravenous (IV) antibiotics while hospitalized. On December 20, 1995, he was released from the hospital and was administered IV antibiotic therapy by home health care. He was readmitted to the hospital when he became nauseated and suffered temporary kidney failure as a result of a reaction to the antibiotics. This condition required dialysis, but the problem was eventually resolved.
A medical review panel found that the initial treatment of the wound by all concerned was appropriate; however, the panel found that there were substantial issues of fact concerning the administration of the antibiotics.
On January 26, 1998, plaintiffs, Andrew and Jacquelyn Watson, filed suit against Dr. Brazeel and his insurer, The Medical *1278 Protective Company, Ms. Ramsey, Dr. Bulloch, and St. Francis Medical Center. The parties reached a settlement as to the plaintiffs' claims arising from the administration of the IV antibiotics. The matter proceeded to trial only against Dr. Brazeel and his insurer. It was stipulated that the only issue remaining concerned the initial treatment of the injury and that any damages awarded would be from that date, November 17, 1995, until Mr. Watson's readmission to the hospital due to the drug reaction on December 28, 1995. The parties also stipulated that Mr. Watson's medical expenses for this period totaled $23,001.25.
Questioning the credibility of Mr. Watson, the trial court found in favor of defendants. We reverse.

Discussion
There is no dispute in this case as to the applicable standard of care. Dr. Brazeel testified that the standard of care would include inspecting the wound, opening the laceration and checking for foreign bodies and debris. It would also include irrigating the wound with peroxide, saline, water, or any combination of those substances. Dr. Brazeel agreed that ultimately, he was responsible for seeing that the standard of care was implemented.
Ms. Ramsey testified that another nurse in the clinic was to clean the wound with peroxide and saline. Ms. Ramsey stated that she thought the wound had been cleaned because Mr. Watson's foot was wet when she entered the room. However, she did not personally clean the foot nor did she see anyone else do so. Further, Ms. Ramsey testified that, although a tetanus shot was ordered for Mr. Watson, she does not know if it was actually given. Ms. Ramsey stated that she spread the wound slightly apart and examined it. She denied seeing any debris in the wound. She claimed that after Dr. Brazeel determined that sutures were not necessary, an antibiotic ointment was applied to the laceration. Ms. Ramsey testified that she instructed Mr. Watson to wash his foot with warm, soapy water every day and to apply antibiotic ointment three times per day.
Ms. Ramsey stated that she had no reason to believe that the standard plan was not followed. She said, "I have to feel confident that the people who work for me and with me in the clinic would have no reason to not execute my plan. That had never happened in the past." No one testified that these cleaning procedures were done, nor were any such procedures noted or charted in the medical record.
Ms. Ramsey detailed five follow-up visits in November and December 1995 by Mr. Watson in which there was a yellowish discharge from the wound with swelling and continued complaints of pain.
Mr. Watson testified that when he initially went to OccuMed, no one spread the wound open to look for debris. He said that his foot was merely twisted back and forth. Ms. Ramsey then poured a brown liquid, Betadine, over it. He denied being given a tetanus shot and stated that he was not instructed to wash the foot or to apply ointment. He further stated that he did not receive any written instructions regarding wound care. According to Mr. Watson, he was told not to get the foot wet. He returned for follow-up visits because his foot continued to swell. He claims that he was not given any instructions about cleaning the foot until his third visit.
The defense attempted to impeach Mr. Watson with deposition testimony in which he stated that some liquid was poured over his foot. Mr. Watson did not dispute that statement, but reiterated that the only liquid used was Betadine. He consistently *1279 testified that the foot was not cleaned with any other substance.[1]
Dr. Brazeel said that when he initially saw Mr. Watson, he only looked at the wound to determine if it needed sutures. Dr. Brazeel testified that he did not clean the wound and did not see anyone else clean it. He stated that, "The instructions were clearly given to clean the wound with peroxide.... I would assume that those things occurred." He also acknowledged that there was no documentation in the medical record that the wound was cleaned. He assumed that Ms. Ramsey had done an adequate examination of the foot.
Dr. Bulloch's surgical report shows that there were large amounts of black debris inside the wound. He removed from the wound 20 to 40 particles that were between one and two millimeters in size. This "small blackish appearing material" was confirmed in the pathology report to be foreign matter. This material caused aggravation of the soft tissue and bone in Mr. Watson's foot. Dr. Bulloch believed that this matter was from the time of the initial injury.
Dr. Desormeaux, an internal medicine specialist, testified by deposition on behalf of the plaintiffs. He stated that the medical chart in this case did not provide thorough documentation. He noted that irrigation of the wound and a tetanus shot were ordered, but there is no showing that the orders were carried out. Further, there was no description of how thoroughly the wound was examined. According to Dr. Desormeaux, the record indicates that the wound was to be cleaned with peroxide. However, he stated that the standard of care is to flush the laceration with copious amounts of saline, not just peroxide. Dr. Desormeaux said that there is no documentation in the medical record to substantiate the nature and extent of the treatment received by Mr. Watson. He testified that it could not be proved from the medical record that the wound was cleaned and thus, he opined that Mr. Watson received substandard care. Dr. Desormeaux stated that Dr. Brazeel was ultimately responsible for seeing that all necessary treatment was rendered to Mr. Watson.
Dr. Eugene Benson Scott, II, a family practice physician and a member of the medical review panel, testified that the panel received no information that Mr. Watson's care in this case was substandard.
The defense can not or will not say what was done before Nurse Ramsey or Dr. Brazeel saw Mr. Watson. They argue that it is plaintiffs' burden to prove that the clinic's plan was not followed. Dr. Brazeel further contends that a medical expert must specifically state that there was a breach of the standard of care. The medical charts do not show debridement, irrigation or cleaning of the wound. Mr. Watson testified that this was not done. Mr. Watson's foot became infected. Dr. Bulloch found numerous particles of foreign material that had been in the wound since the injury.
We recognize that credibility determinations of a trial court are not to be reversed absent manifest error. However, in this case, we do not find, as did the trial court, that Mr. Watson was inconsistent in his testimony concerning how his foot was treated. He consistently stated that only Betadine was used and that his foot was not irrigated with peroxide and/or saline. *1280 Although Ms. Ramsey and Dr. Brazeel were also credible witnesses, they could not testify that Mr. Watson's foot was actually irrigated. Further, Dr. Bulloch opined that the debris which caused the irritation had been in place since the time of injury. There is no direct evidence in this record to dispute Mr. Watson's claim that his foot was not properly treated. Under these circumstances, we find that Mr. Watson carried his burden of proof. The trial court's decision to the contrary is reversed.

Comparative Fault
Dr. Brazeel contends that Mr. Watson's failure to clean the wound and apply the ointment contributed to his injury.
A party asserting comparative fault bears the burden of proof by a preponderance of the evidence that the other party's fault was a cause in fact of the damage complained of. Begnaud v. Camel Contractors, Inc., 98-207 (La.App. 3d Cir.10/28/98), 721 So.2d 550, writ denied, 98-2948 (La.02/05/99), 738 So.2d 1; Bourgeois v. Bailey, 01-1269 (La.App. 5th Cir.04/10/02), 817 So.2d 240.
In the present case, Ms. Ramsey stated that she instructed Mr. Watson to wash his foot in warm, soapy water daily and to apply antibiotic ointment three times per day. Mr. Watson claims that he was not given these instructions. Instead, he claims that he was told not to get the foot wet. Mr. Watson returned to the clinic within three days, on November 20, 1995, and four times thereafter before a bone scan was performed indicating an infection. Under the circumstances, we cannot find any fault on the part of Mr. Watson.

Damages
Plaintiffs argue that, in addition to the stipulated medical expenses of $23,001.25, Mr. Watson is entitled to general damages for pain and suffering and Mrs. Watson is entitled to damages for loss of consortium.
Because the trial court rejected the plaintiffs' claims and did not reach the question of damages, we must make a de novo determination from the facts in the record. LeBlanc v. Stevenson, 00-0157 (La.10/17/00), 770 So.2d 766; Butcher v. City of Monroe, 31,932 (La.App.2d Cir.05/05/99), 737 So.2d 189, writ denied, 99-1608 (La.09/17/99), 747 So.2d 566.
Mr. Watson testified that his foot was painful and began swelling after the injury. He was on crutches and went to follow-up visits at the clinic on November 20, November 27, December 4, December 12, and December 14, 1995. The foot continued to be swollen and eventually became so painful that he could not put weight on it. He was given whirlpool therapy on follow-up visits. On December 14, 1995, Mr. Watson was admitted to the hospital for surgery. He initially resisted the idea of surgery, but consented when informed that the foot might become gangrenous. Mr. Watson was in the hospital from December 14 through December 20, 1995, and was then discharged to his home with IV therapy. Mr. Watson testified that he was still on crutches and required assistance from his wife to get to the bathroom. He also testified that his wife helped him with his treatments and aided in soaking his foot. By December 28, 1995, Mr. Watson was so gravely ill from his IV antibiotic treatments that he was readmitted to the hospital.
As noted above, plaintiffs are only seeking damages from the date of the injury, November 17, 1995, until Mr. Watson's readmission to the hospital on December 28, 1995. The parties settled that part of the case involving the problems resulting from the antibiotic treatment. After the treatment for the antibiotic reaction, it appears *1281 that Mr. Watson's foot healed. There are no complaints in this record of any residual disability as a result of the injury.
We find that an award of $30,000 is sufficient to compensate Mr. Watson for his general damages. Compare Summerall on behalf of Summerall v. Ouachita Parish School Board, 27,643 (La.App.2d Cir.12/08/95), 665 So.2d 734 ($30,000 award for severe injury to a boy's foot); Edwards v. K & B, Inc., 26,002 (La.App.2d Cir.08/17/94), 641 So.2d 1040 ($6,000 award for injury to foot caused by falling merchandise); Davis v. Winn-Dixie Louisiana, Inc., 534 So.2d 150 (La.App. 3d Cir. 1988), writ denied, 536 So.2d 1236 (La. 1989) ($5,000 award for foot injury caused by falling shopping cart which resulted in hospitalization for one week); Courville v. Piggly Wiggly Bunkie Co., Inc., (La.App. 3d Cir.1993), 614 So.2d 1366 ($30,000 award to lady whose foot was injured by falling merchandise); Sagona v. Harris, 97-0129 (La.App. 4th Cir.06/18/97), 696 So.2d 595, writ denied, 97-1902 (La.10/31/97), 703 So.2d 28 ($30,000 award for severe laceration to foot with infection resulting in long hospitalization, two surgeries, and extended recuperative period).
Mrs. Watson asserts a claim for loss of consortium in this case. Loss of consortium claims generally have the following seven items: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Campbell v. Webster Parish Police Jury, 36,391, 36,392 (La.App.2d Cir.09/18/02), 828 So.2d 170. However, not every physical injury will result in a loss of consortium or other general damages. Etheredge v. St. Paul Mercury Insurance Company, 35,832 (La.App.2d Cir.04/03/02), 814 So.2d 119. In the present case, Mrs. Watson did not testify at trial. The parties stipulated that if she had appeared at trial, her testimony would have been the same as that given by Mr. Watson. He stated that after his initial discharge from the hospital, his wife helped him get around the house and aided him in his treatment. Based upon this, we award $500 to Mrs. Watson for loss of consortium.

Conclusion
For the reasons stated above, we reverse the trial court judgment rejecting the medical malpractice claim of plaintiff, Andrew Watson, against defendants, Dr. Steven Brazeel and his insurer, The Medical Protective Company. We find that Dr. Brazeel breached the applicable standard of care owed to Mr. Watson. Accordingly, we enter judgment in favor of Mr. Watson for medical expenses in the amount of $23,001.25 and general damages in the amount of $30,000.00, with legal interest from the date of judicial demand.
Mrs. Watson is awarded $500 for loss of consortium. Costs in this court and below are assessed to defendants.
REVERSED AND RENDERED.
GASKINS, J., dissenting.
I respectfully dissent from the majority's opinion and would affirm the trial court ruling in favor of the defendants. The plaintiff had the burden of proving that Dr. Brazeel failed to use reasonable care and diligence, along with his best judgment in the application of the requisite degree of knowledge or skill. La. R.S. 9:2794A(2). Although the plaintiffs' witness, Dr. Desormeaux, stated there was no documentation in the record of the treatment that had been rendered to Mr. Watson, he did not testify that Dr. Brazeel's treatment fell below the standard of care. *1282 While the treatment was not documented as rendered, the appropriate plan for treatment was outlined in the medical records. The fact that Nurse Ramsey noted the foot was wet indicated to her that the usual procedure where the initial nurse flushes the wound was performed. Also, Nurse Ramsey saw no debris when she inspected the wound. The trial court apparently did not give credence to Mr. Watson's testimony about his treatment. Accordingly, I would affirm.
NOTES
[1] Mr. Watson also testified that he did not get out while recuperating. The defense tried to impeach that statement and the witness acknowledged that he was involved in an automobile accident going to and from church.